## MOSS v. INGRAM et al. (No. 1291.)*

(Court of Civil Appeals of Texas. El Paso. March 9, 1922. Rehearing Denied April 13, 1922.)

1. **Appeal and error** ⟜930(3)—**In case tried upon special issues, issues not submitted and not requested to be submitted presumed to have been found so as to support judgment.**

Where the case was tried upon special issues, all issues of fact not submitted to the jury and not requested to be submitted must be deemed to have been found by the lower court in such manner as to support the judgment provided there is evidence to sustain such findings under Rev. St. art. 1985.

2. **Husband and wife** ⟜198—**Permanently abandoned wife, who purchased property but destroyed deed and caused vendor to convey land directly to third party, held estopped from asserting title as against third party.**

Where wife, who had been permanently abandoned by husband, purchased land, and on sale thereof to third party destroyed deed that she had received from vendor, and caused vendor to execute a deed directly to third party, she was estopped from asserting title as against third party on the ground that there was no conveyance to third party from her in which husband joined.

3. **Husband and wife** ⟜193—**Wife, permanently separated from husband, may convey land without joinder of husband in deed.**

A married woman, who is permanently separated from husband, may convey her land without his joinder in the deed without first obtaining permission of the District Court, notwithstanding Rev. St. 1911, art. 4621, as amended by Acts 33d Leg. (1913) c. 32, § 1 (Vernon's Sayles' Ann. Civ. St. 1914, art. 4621), and regardless of necessity of sale, the length of time elapsing between abandonment and conveyance, and the question of whether the husband abandoned the wife or the wife abandoned the husband.

4. **Appeal and error** ⟜1027—**Rulings respecting pleas in reconvention harmless, where no relief was granted.**

Rulings respecting pleas in reconvention filed by defendants *held* harmless on writ of error by plaintiff, where such defendants were not granted relief upon the cross-actions.

Error from District Court, Stephens County; W. R. Ely, Judge.

Suit by Mrs. C. E. Moss against S. W. Ingram and others. Judgment for defendants, and plaintiff brings error. Affirmed.

Claude C. Westerfeldt and Lively & Dougherty, all of Dallas, for plaintiff in error.

Goggans, Bateman & Leaverton, of Breckenridge, Wm. J. Berne, of Fort Worth, Alvin Richards, of Tulsa, Okl., Butts & Wright, of Cisco, and Scott, Brelsford, Funderburk & Ferrell, of Eastland, for defendants in error.

HIGGINS, J. On February 14, 1920, Mrs. Moss, the plaintiff in error, brought this suit to recover a 467/10-acre tract of land in Stephens county against S. W. Ingram, J. P. Ingram, Elbert Hill, the Oklahoma Producing & Refining Corporation of America, the Pennock Oil Company, the Prairie Oil & Gas Company, and W. P. Moss.

The land in controversy is the same involved in the suit of W. P. Moss v. Seth Ingram (Tex. Civ. App.) reported in 224 S. W. 258, wherein the defendant in the present suit, W. P. Moss, sought to recover said land of the present defendant, S. W. Ingram. W. P. Moss is the husband of the plaintiff in error. S. W. (Seth) Ingram gave to J. H. Sudderth an oil and gas lease upon the land, reserving a one-eighth royalty. The Sudderth interest passed to the two companies first named. J. P. (Jim) Ingram and Elbert Hill acquired from S. W. Ingram an interest in the royalty reservation. The Prairie Oil & Gas Company purchased a large amount of oil produced from the land by the two companies first named, and judgment against the Prairie Company was sought for $550,000, the alleged value of the oil so appropriated by it.

By reference to the report of the case of W. P. Moss v. Seth Ingram, it will be noted that the plaintiff therein sued to recover upon the theory that the land belonged to the community estate of himself and wife, the present plaintiff in error, and judgment against him was rendered upon the theory that it was the separate property of Mrs. Moss. In her petition herein Mrs. Moss—

"asks that she be allowed to prosecute this suit for and recover in her own name the property involved herein and hereafter fully described, for the reason it is her separate

property, being purchased since her marriage and with proceeds from the sale of land owned by her before she married the said W. P. Moss; that before and ever since the accrual of the cause of action hereinafter alleged, he, the said W. P. Moss, has deserted her, and left her and their child to their own resources, and has ever failed and refused to bring suit for the recovery of said property as her separate property, but wrongfully and unlawfully attempted to recover same by suit as his community property, to which she was in no wise a party, but successfully protests against the same."

The case was submitted upon special issues. These issues and the answers thereto are as follows:

"Q. 1. Did Mrs. Moss pay Yocum the down payment on the land in controversy out of her separate estate? A. Yes.

"Q. 2. Did Mrs. Moss, the plaintiff, authorize her son, Charlie Latham, to sell said land to J. P. Ingram? A. Yes.

"Q. 3. Did Mrs. Moss authorize her son, Charlie Latham, to sell said land to S. W. Ingram? A. Yes.

"Q. 4. Did Mrs. Moss authorize her son, Charlie Latham, to burn her deed from Yocum to her? A. Yes.

"Q. 5. Did Mrs. Moss authorize Yocum to execute and deliver his deed to S. W. Ingram conveying the land in controversy? A. Yes.

"Q. 6. When did Mrs. Moss first know that her deed had been burned, and Mr. Yocum had executed and delivered his deed to S. W. Ingram? A. When she accepted payment of wagon and mules, etc.

"Q. 7. When did Mrs. Moss first learn, from her son, that J. P. Ingram had given to him a pair of mules, wagon, etc., for the land, and to whom did she understand he had sold the land? A. When she received the payment of wagon, mules, etc.

"Q. 8. Did Mrs. Moss, at any time, after she knew that the land in controversy had been sold to S. W. Ingram, and not to Jim Ingram (if you so find), recognize that she had no claim to the land? A. Yes.

"If you answer the foregoing questions in the affirmative, then answer:

"Q. 9. Did Mrs. Moss acquiesce in said transaction? A. Yes.

"Q. 10. Did the Oklahoma Producing & Refining Corporation and Pennock Oil Company drill a well or wells on the land in controversy, and develop oil in paying quantities on it? A. Yes.

"Q. 11. If you answer the foregoing in the affirmative, you will answer the following questions:

"What amount or sum of money did each of said defendants expend in drilling wells and developing oil on said land? Answer, and in answering this question you will deduct from the total cost of drilling the wells the value of all property salvaged? A. $204,000. Salvage, 35%.

"Q. 13. Was Charlie Latham authorized by his mother to act for her in negotiating the sale of the land in controversy? A. Yes.

"Q. 14. Did Mrs. Moss agree with Charlie Latham to sell the land to S. W. Ingram if the latter would pay the $250 vendor lien note she owed Yocum for it? A. Yes.

"Q. 15. Did Mrs. Moss understand and agree for Charlie Latham to sell her said land to S. W. Ingram and burn her deed from Yocum and have Yocum execute and deliver to S. W. Ingram a deed to the land? A. Yes.

"Q. 16. When Charlie Latham took the mules, etc., and Mrs. Moss sold the wagon for $20 and used the $20, did she know that the land had been conveyed to S. W. Ingram? A. Yes."

Supplementing the findings of the jury, we find that there is evidence tending to show the following:

On or about February 1, 1915, Mrs. Moss purchased the land from B. F. Yocum, and received from him a deed therefor. She paid therefor $250 cash, belonging to her separate estate, and executed a promissory note for $250 in Yocum's favor. This deed was not placed of record. There is nothing to show whether or not there was an express reservation in the deed of a vendor's lien to secure the payment of the note, nor is it shown that the note acknowledged and retained such a lien. This note was not paid. Subsequently, in 1916, her son, Charlie Latham, told his mother that the defendant, J. P. (Jim) Ingram would buy the land from her, and she authorized her son to sell the same.

According to the testimony of Mrs. Moss, corroborated by her son, Charlie Latham, she was willing to sell the land to Jim Ingram because he was her son-in-law, and the property would remain in the family, and the authority given her son was to sell to her said son-in-law.

The evidence shows that the negotiations for the sale were between Jim Ingram and Charlie Latham, representing his mother. Jim Ingram agreed with Latham to give for the land a wagon, two mules, harness, 12 bushels of corn and $14 in money. Thereupon Jim Ingram and Latham went to the justice of the peace to prepare the deed. The justice inquired if the husband would sign the deed, and, upon being informed that he would not, suggested to the parties that the unrecorded deed from Yocum to Mrs. Moss be destroyed, and Yocum then convey the land direct. According to the testimony of Charlie Latham the justice refused to prepare the deed until Latham went to his mother and obtained the old deed and written authority from Mrs. Moss for Latham to act for her. Latham went to his mother and obtained the Yocum deed and a written authority of some kind from her, but the nature of such written authority is not shown with any certainty. Thereupon Jim Ingram delivered to Latham the wagon, mules, harness, corn, and money as agreed. When the deed from Yocum was to be prepared, Jim Ingram, according to Latham's testimony, directed that it be made to his father, S. W. Ingram, which was done without objection by Latham. Yocum then ex-

ecuted and delivered the deed to S. W. Ingram, who paid Yocum $20 interest then due upon the note of Mrs. Moss. In rurther payment S. W. Ingram executed and delivered to Yocum his note for $250, and subsequently paid same. According to the testimony of S. W. Ingram he had no negotiations with Latham or Mrs. Moss for the land, but arranged to buy it from his son, Jim Ingram, and paid Jim Ingram for the land $100 in cash, and released him from a debt owing of $150. Upon the execution and delivery of the deed from Yocum to S. W. Ingram Charlie Latham went to S. W. Ingram's home, and there destroyed the old deed from Yocum to his mother, with the knowledge and consent of S. W. Ingram.

Notwithstanding the direct testimony of Mrs. Moss and her son that she did not authorize the latter to sell the land to S. W. Ingram, we are of the opinion that an issue in this respect was raised by all of the facts and circumstances of the case, and particularly by the testimony of several witnesses, substantially, to the effect that, while the suit of W. P. Moss was pending against S. W. Ingram, she stated that she had sold the land and claimed no interest in it. Judge Bateman, Ingram's attorney in that suit, testified:

"I will state what was said in the course of that conversation as to her claiming that land or not claiming it. She said she had sold the land, and she claimed no interest in it. She said she had sold it to Mr. S. W. Ingram. That conversation was several months before the suit was tried. That suit was tried in March, 1919. * * *

"She had agreed to come and testify as a witness in the case for Mr. S. W. Ingram. She was joined as party plaintiff in the suit with Mr. Moss, and she said Mr. Moss made her party plaintiff without her knowledge and consent, and she felt that Mr. Ingram had bought the land and paid her what it was worth, and she didn't claim any interest in it and she had consented to come and testify as a witness."

Also by a deposition which she gave in the W. P. Moss suit, wherein she testified:

"Int. 9. It is alleged in plaintiff's petition that the property involved in this suit and above described was deeded to you by B. F. Yocum on the 28th day of February, 1915. Please state what payment, if any, you made down on this place at the time you bought it. Ans. $250."

"Int. 11. Why did you not keep said place and pay for it? Ans. Could not make the payments, as I had paid all the money I had on the place.

"Int. 12. It is a fact, is it not, that some loan company held an indebtedness of $250 against this land, and that same was about due at the time you let it go back to B. F. Yocum? Ans. Yes; I do not remember just when it was due.

"Int. 13. Did you let this property go back to B. F. Yocum because you were unable to pay for same and for the purpose of protecting your separate funds which you had made as a part of said property? Ans. Yes.

"Int. 14. It is a fact, is it not, that your husband, W. P. Moss, had abandoned you prior to the time that you let said land go back to the said B. F. Yocum? Ans. Yes.

"Int. 15. It is a fact, is it not, that your husband abandoned you in Stephens county, and went to some other county in Texas and lived before you let this land go back to Yocum? Ans. Yes. He went to Fort Worth to live with his daughter.

"Int. 16. Are you now claiming any of this 40 acres of land which you let go back to Yocum, and which Mr. Ingram now owns. If so, why so, and, if not, why not? Ans. No; I feel like when I let it go back I got my money's worth out of it, and now I hold no claim against it."

"Int. 18. Are you now wanting to regain said land, or any portion, from Ingram or Sudderth; if not, why not? Ans. No, I don't feel like I am due any of it."

[1] This case having been tried upon special issues, all issues of fact not submitted to the jury, and not requested to be submitted, must be deemed to have been found by the court below in such manner as to support the judgment rendered, provided there be evidence to sustain such findings. Article 1985, R. S.

Upon the findings of the jury and the presumed findings of the court below we deduce as conclusions of fact that Mrs. Moss was abandoned by her husband on December 18, 1914, since which time they have been permanently separated; that the land in controversy became her separate property by the deed to her from Yocum; that she authorized her son Charlie Latham to sell the land to S. W. Ingram; that it was the intention and purpose of all the parties to pass title from Mrs. Moss to S. W. Ingram by the destruction of Mrs. Moss' unrecorded deed and the execution of a new deed by Yocum to S. W. Ingram; that Mrs. Moss and her agent, Charlie Latham, received the consideration agreed upon for the sale, and S. W. Ingram has paid the full purchase price for the land, and that subsequent to the destruction of her deed and the execution and delivery by Yocum of the deed to Ingram, Mrs. Moss, with knowledge of all the facts, acquiesced in and ratified the transaction, and disclaimed any interest in the land.

The plaintiff filed a motion for an instructed verdict in her favor, which was overruled. Upon the return of the verdict she filed motion for judgment in her favor, which was also overruled, and judgment entered for the defendants. No motion was filed to set aside the findings of the jury, nor was there any motion for new trial.

The sixth assignment complains of the overruling of the motion for an instructed verdict. We hold that there was evidence raising the issues submitted to the jury by the court, and sufficient to support the find-

ings made. If the facts found by the jury and the presumed findings of the trial court support the judgment rendered, then there was no error in overruling the motion for an instructed verdict, and for the reasons hereinafter indicated we think the proper judgment was rendered on the facts found.

The first, fifth, seventh, and eighth assignments complain of the court's action in rendering judgment for the defendants upon the jury's findings and in refusing to sustain the plaintiff's motion for judgment in her favor notwithstanding the findings made. These assignments present the questions of law upon which it is contended that under the undisputed facts upon issues not submitted to the jury the plaintiff was entitled to judgment.

It is contended by Mrs. Moss that title to the land was vested in her as her separate property by the deed to her from Yocum, and the same has never been divested because she did not convey the same to Ingram by conveyance in writing, signed and acknowledged by herself and husband as by law required.

Our statute of conveyance and the statute of frauds require that all conveyances of land be in writing, signed and delivered by the party disposing of the same or by his agent thereunto authorized in writing. It is also a statutory requirement that in a conveyance of the separate real estate of the wife the husband must join. But, notwithstanding the provisions of the statutes of conveyances and frauds, there are instances in which the doctrine of estoppel may be invoked against persons sui juris and a recovery of lands denied, even though the requirements of those statutes have not been observed.

Pertinent to the instant facts is the case of Stanley v. Epperson, 45 Tex. 644. In that case, after a deed had been delivered to the grantee, but not recorded, the latter sold the land to a third party, and by agreement between one of the grantors, the grantee, and the purchaser, the name of the grantee was erased, and that of the purchaser inserted in the original deed. It was held that the alteration of the deed after delivery, whether recorded or not, could not have the effect to revest the title in the grantor or abrogate or annul the title of the grantee; but that—

"While it is true the altered deed of itself cannot be held to be either the deed of Stanley and wife [the grantors] to Epperson [the purchaser from the grantee] or a deed from Henderson [the grantee] to him, yet the facts show that it would operate as a fraud upon appellee [Epperson] to permit Henderson, in whom the title was vested, to deny that it has been thereby conveyed to appellee. He is therefore estopped from doing so."

In the very recent case of Cooper v. Hinman, 235 S. W. 564, by the Commission of Appeals the doctrine of estoppel upon which Stanley v. Epperson is based was considered, the authorities reviewed, and upon the authority of that case it was held that a grantee in an unrecorded deed, who returns the instrument to the grantor with a mutual understanding that the title is hereby to revest in the grantor, is estopped · to assert title under the deed as against a subsequent vendee of the grantor. See, also, Lapowski v. Smith, 1 Tex. Civ. App. 391, 20 S. W. 957; Dycus v. Hart, 2 Tex. Civ. App. 354, 21 S. W. 299; Cadwallader v. Lovece, 10 Tex. Civ. App. 1, 29 S. W. 666, 917; Robinson v. Monning D. C. Co. (Tex. Civ. App.) 211 S. W. 535.

[2] The facts in the case at bar bring it within the rule of decision announced in the cited cases, unless the coverture of Mrs. Moss renders same inapplicable. In this connection plaintiff in error relies upon the rule announced in Johnson v. Bryan, 62 Tex. 623, that to estop a married woman from asserting her right to land she must be guilty of some positive act of fraud or some act of concealment or suppression which in law would be equivalent thereto. This is in accord with the well-recognized—

"general view that the conveyance of a married woman cannot operate against her by way of estoppel where, because not executed in conformity with the statute, it cannot operate directly as a conveyance. This is manifestly just and proper; a ruling which would give effect to a covenant of a married woman as a quasi conveyance of her real estate attempted by her to be conveyed without a compliance with the requirements of the statutes would be in flagrant violation of the spirit and letter of the law in regard to the transfer of real estate by married women for whose protection the requirements are demanded." 13 R. C. L. 1312.

This is the doctrine of the Texas courts as is illustrated by the case of Daniel v. Mason, 90 Tex. 240, 38 S. W. 161, 59 Am. St. Rep. 815, where Judge Denman said:

"If the mere execution of a deed and receipt of the purchase money constitute an estoppel, then in all cases, though a married woman has no capacity to convey by deed wherein she is not joined by her husband, nevertheless the deed and its subsequent recording by the purchaser would pass the title by estoppel. Thus the attempt to make a conveyance which she has no legal capacity to make would, of itself, be held sufficient to estop her and her heirs from denying its binding force. This would virtually remove the disability of coverture. Such a rule has never been recognized in this state."

Since a married woman is thus exempt from the application of the ordinary doctrine of estoppel by deed because of the disability of coverture, it becomes material to determine whether, under the facts of this case, Mrs. Moss was under such disability. She testified that her husband left her December 18, 1914, and that they have since lived apart.

[3] It is definitely established that upon the abandonment of the wife by the husband and their permanent separation she may convey her land without his joining in the deed. Wright v. Hays, 10 Tex. 130, 60 Am. Dec. 200; Hector v. Knox, 63 Tex. 613.

And to enable the abandoned wife to so convey it is not necessary that there be a necessity for the sale. The question of necessity is material only when the abandoned wife sells community property. Clements v. Ewing, 71 Tex. 370, 9 S. W. 312.

Furthermore, the length of time elapsing between the abandonment and the wife's conveyance is not material, except in evidence to show whether the absence is merely temporary or permanent. Her power to convey arises out of the fact of permanent abandonment, and not on the length of its continuance. Fullerton v. Doyle, 18 Tex. 3.

And "whether the husband has abandoned the wife, or the wife abandoned the husband, is a matter of no consequence." Davis v. Saladee, 57 Tex. 326; Fullerton v. Doyle, supra.

There are many other reported cases upholding the power and authority of an abandoned wife to contract particularly with reference to her separate estate, as if she were a feme sole. See Butler v. Robertson, 11 Tex. 142, where the wife, after abandonment by her husband, was held personally liable on a note executed by her alone.

And in Wright v. Blackwood, 57 Tex. 644, the wife was held personally bound by a power of attorney, granting power to repair her separate estate, executed after she had separated from her husband, under which the donee of the power executed a contract to repair, whereunder the other party acquired a valid lien.

Wright v. Hays, supra, involved the validity of a deed executed by an abandoned wife. The conveyance was upheld. In the course of the opinion it was said:

"The default of the husband and the necessity of the wife's situation, require and the law authorizes her to assume his position, for the care of herself, her family and property, and vests her with the capacity of a feme sole. His desertion and absence are the foundation of her new rights and authority. His absence or civil death are prerequisites to the acquisition of these rights by the wife. The joining of the husband in the wife's conveyance, her privy examination and declaration that she acts freely, all presuppose that a husband is present and may be exercising undue influence over her. But how can these formalities be requisite in cases where the right of the wife (and they are acknowledged by law) depend upon the supposition that, de facto, she has no husband? How could he join in a conveyance, when his absence is the ground upon which she acquired her right of property, and upon which she can make contracts and sue and be sued in her own name?"

Harris v. Hamilton (Com. of Appeals) 221 S. W. 273, involved the validity of a deed of trust executed by an abandoned wife upon her homestead. The lien was upheld. In that case it was said:

"The power to convey necessarily includes the power to mortgage, in the absence of some constitutional or statutory inhibition. It has been repeatedly held in this state that a married woman, after being permanently abandoned by her husband, can convey her separate property, whether her homestead or not, without the joinder of her husband. [Citing authorities.] The basis of these decisions is that, while the relation has not been legally severed, a status is created in the wife, in so far as her property rights are concerned, identical with that of a feme sole, giving her full power over her property the same as if the marital relation did not exist."

From these decisions and others which might be cited we are of the opinion that the permanent separation of Mrs. Moss and her husband operated to remove her disability of coverture so far as it related to the necessity of her husband joining in a deed conveying her separate estate, and that by such separation she was reinvested with full authority to convey such estate by deed as if she were a feme sole. This being the case, she is estopped by her acts the same as other persons sui juris. See 10 R. C. L. subject Estoppel, § 55, where it is said:

"In the discussion of the subject of estoppel against married women little consideration is due to the common-law rule that a married woman, by reason of her inability to contract, is not bound by an estoppel. Under constitutional provisions and enabling statutes, which exist very generally, the common-law disabilities, of married women to contract have been removed, and the prevailing doctrine now is that a married woman, who deals, or assumes to deal, in respect to a matter concerning which her common-law disabilities have been removed, is bound by an estoppel the same as any other person. On the other hand, if the contract relates to a matter concerning which the common-law disabilities continue, so that the contract is void for want of capacity or power to make it, the doctrine of estoppel cannot be invoked. When the doctrine of estoppel is allowed to operate against a married woman, it is governed by the principles applicable to estoppels generally, and must be confined to cases where she is attempting to enforce a right inconsistent with her previous conduct, on which the other party has relied. And, of course, when a married woman of full age has become discovert she may be estopped by her acts, the same as other persons sui juris."

Since she was permanently separated from her husband at the time of the attempted transfer of title to Ingram in the manner indicated above, we conclude that the doctrine of estoppel announced in Stanley v. Epperson and Cooper v. Hinman, supra, is applicable and that she is estopped to recover the land from Ingram.

In this connection plaintiff in error contends that the rule of decision giving to an abandoned wife the power to convey without

the joinder of her husband has been abrogated by the act of the Thirty-Third Legislature, page 61, amending article 4621, R. S. 1911, (Vernon's Sayles' Ann. Civ. St. 1914, art. 4621). By this act it was provided that if the husband refuse to join with the wife in the incumbrance or conveyance of the wife's separate real estate, she might apply to and obtain permission from the district court to so incumber or convey her said estate without the joinder of her husband. Plaintiff in error insists that this act provides the exclusive and only way in which the wife may incumber or convey her separate real estate without the joinder of her husband, and that the permission of the district court so to do is an indispensable prerequisite. But we do not so construe the act. In our opinion it was cumulative of her rights theretofore recognized, and not restrictive thereof. Article 4621 was again amended in 1917 (Vernon's Ann. Civ. St. Supp. 1918, art. 4621). The last amendment deals with the right of a permanently abandoned wife to incumber and convey her separate estate, but that amendment was subsequent to the transaction here involved, and it is unnecessary to consider what, if any, effect it had upon the right theretofore recognized of an abandoned wife to convey her separate estate.

The third assignment relates to a ruling upon evidence. It presents no error because the testimony was relevant and material to show that she authorized the sale to S. W. Ingram, and ratified and acquiesced in the entire transaction.

The fourth assignment also complains of the admission of evidence. In view of the ruling upon the controlling issue of estoppel, the error, if any, in the admission of the evidence is harmless.

[4] The second, ninth, and tenth assignments relate to alleged errors respecting pleas in reconvention filed by the Oklahoma Corporation and Pennock Company. Said defendants were granted no relief upon the cross-actions, so the rulings, if erroneous, are harmless.

Affirmed.